UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS DEVELOPMENT FINANCE AGENCY,<br><br>　　　Plaintiff<br><br>v.<br><br>ADP MARSHALL, INC., a FLUOR DANIEL COMPANY, and FIREMAN'S FUND INSURANCE COMPANY,<br><br>　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | )<br>) | CIVIL ACTION<br>NO. 04-CV-10203-PBS |
| ADP MARSHALL, INC.,<br><br>　　　Plaintiff-in-Counterclaim,<br><br>v.<br><br>MASSACHUSETTS DEVEOPMENT FINANCE AGENCY,<br><br>　　　Defendant-in-Counterclaim | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| ADP MARSHALL, INC.,<br><br>　　　Third-Party Plaintiff<br><br>v.<br><br>ALLIED CONSULTING ENGINEERING SERVICES, et al.<br><br>　　　Third-Party Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**OPPOSITION OF THIRD-PARTY DEFENDANT,
SPAGNOLO/GISNESS & ASSOCIATES, INC, TO THIRD-PARTY PLAINTIFF,
ADP MARSHALL, INC.'S MOTION FOR SUMMARY JUDGMENT**

The third-party defendant, Spagnolo/Gisness & Associates, Inc. ("SGA"),

respectfully submits this Memorandum in Opposition to the Motion for Summary

Judgment filed by the third-party plaintiff, ADP Marshall, Inc. ("ADPM"). ADPM

claims that it is entitled to summary judgment as to Counts XVIII and XIX of its Third-Party Complaint seeking recovery on theories of breach of contract and indemnification and contribution. ADPM's motion must fail for at least four reasons. First, the plaintiff has not alleged that SGA was negligent so as to trigger the indemnification provision which ADPM alleges governs this action. Second, the indemnification clause at issue is void because it violates M.G.L. c. 149, § 29C. Third, no separate "property" has been damaged as required by the indemnity provision and if property was damaged, it was not within the time covered by the indemnity provision. Fourth, summary judgment must be denied because genuine issues of material fact exist as to the meaning of the language within the indemnification clause. Accordingly, and for the reasons set forth in more detail below, ADPM's Motion for Summary Judgment should be denied in all respects, and pursuant to Fed. R. Civ. P. 56(b), summary judgment should be awarded in favor of SGA.

## I. <u>STANDARD OF REVIEW</u>

The moving party is not entitled to summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324-325 (1986); <u>Villanueva v. Wellesley College</u>, 930 F.2d 124, 127 (1st Cir. 1991), <u>cert. denied</u>, 502 U.S. 861 (1991); <u>Desmond v. Federal Deposit Insurance Corp.</u>, 798 F. Supp. 829, 830-31 (D. Mass. 1992). To avoid summary judgment, an opposing party must only demonstrate the existence of a genuine dispute over a material fact. An issue is genuine if evidence is such that a reasonable jury could

return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); see also McConnell, et al. v. Texaco, Inc., 727 F. Supp. 751, 755

(D. Mass. 1990). In considering a motion for summary judgment, district courts must

view the entire record in the light most favorable to the party opposing summary

judgment, indulging all reasonable inferences in that party's favor. Suarez v. Pueblo Int'l,

Inc., 229 F.3d 49, 53 (1st Cir. 2000).

## II. RELEVANT MATERIAL FACTS

As to ADPM's concise statement of material facts, SGA does not contest numbers

1-3. As to number 4, SGA denies that allegations within the plaintiff's Complaint relate

to the architectural services provided by SGA. The plaintiff's expert disclosures are

irrelevant for determining whether SGA has a duty to defend because the Court must look

to the allegations within the Complaint. See Complaint. As to number 5 of ADPM's

concise statement of material facts, SGA admits that it received a letter dated February 5,

2005 from ADPM which notified SGA of the Complaint. However, SGA denies that the

plaintiff's claims in its Complaint relate to SGA's architectural services. See Complaint.

This matter arises out of the construction of the Advanced Technology and

Manufacturing Center in Fall River, Massachusetts (the "Project"). The plaintiff

financed the Project and retained ADPM to serve as the Project's design/build contractor.

See Amended Third-Party Complaint, ¶ 6. On or about September 26, 2000, SGA

entered into an agreement with ADPM (the "SGA Agreement") to provide architectural

services for the Project. SGA's scope of services consisted of providing "core and shell

architectural services only and structural foundation design services only" in accordance

with drawings prepared by Symmes Maini & McKee Associates. See Exhibit A. SGA's

scope of services specifically excluded items involving "[c]onsulting engineers for

HVAC, plumbing, electrical, and environmental." See Exhibit A. Consequently, SGA's

contractual obligations did not include design and/or specification of the HVAC system.

See Gisness Affidavit, Exhibit B, ¶ 3. SGA also conducted periodic site visits during

construction and until the Project was occupied. See Exhibit B, ¶ 4. The Project was

substantially complete on or about August 20, 2001 and was occupied in December 2001.

See Complaint, ¶¶ 21, 22.

On or about December 29, 2003, the plaintiff brought a Complaint against

ADPM, alleging specifically that ADPM is liable for alleged deficiencies with the

installation of the HVAC system and windows. See Complaint, ¶¶ 30, 31, 34, 35, and 38.

The plaintiff alleges that the deficiencies occurred after the Project was occupied in

December 2001. See Complaint, ¶¶ 23, 27. ADPM notified SGA of the Complaint in a

letter dated February 5, 2005. See Third-Party Complaint, ¶ 116. ADPM then proceeded

to bring a Third-Party Complaint against its various subcontractors and subconsultants,

including SGA and those responsible for the HVAC and windows. See Third-Party

Complaint. In its Third-Party Complaint, ADPM makes no specific allegations against

SGA but instead adopts the allegations of the plaintiff, none of which reference SGA.

See Third-Party Complaint. In other words, ADPM essentially attempts to shift the

blame for any alleged deficiencies to the third-party defendants.

The architectural services provided by SGA for the Project were consistent with

the applicable professional standard of care. See Exhibit B, ¶ 5. SGA performed its

services with care and in no way provided deficient services for the Project. See Exhibit

B, ¶ 5.

### III. ARGUMENT

**A.     ADPM's Motion for Summary Judgment Must Fail Because the Complaint Does Not Create a Duty to Defend.**

ADPM seeks summary judgment based on the indemnity provision that does not require defense or indemnity for the allegations in the Complaint. The indemnity clause only extends to "any claims…arising out of or relating to…damages to or loss of property…arising directly or indirectly out of [SGA's] acts or omissions…during the performance of the services…." See Exhibit A, §§ 7.2 , 7.2.1. Even in the insurance context (and this is not insurance), "the duty to defend is based on the facts alleged in the complaint and those facts which are known by the insurer." Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 10-11 (1989)(where court relied on allegations set forth in both the complaint and the third-party complaint in determining whether the third-party defendant had a duty to defend). However, "there is no duty to defend if, at the time the claims were advanced, the insurer could reasonably have concluded that no aspect of the claims … fell within the scope of the coverage." Open Software Found., Inc. v. United States Fid. & Guar. Co, 307 F.3d 11, 14 (1st Cir. 2002)(holding that facts extrinsic to the plaintiff's allegations in the complaint, uncovered at any stage of the underlying action, cannot independently trigger a duty to defend), quoting Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 35 (1st Cir. 1997) (citing Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 610 N.E.2d 912, 916 (Mass. 1993). In other words, if the allegations within the Complaint do not fall within the scope of the coverage, an insured cannot compel the insurer to defend it simply by "telling the insurer facts that would create coverage." Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 545 N.E.2d 1156, 1160 (Mass. 1989)(plaintiff's

introduction of outside publication did not conclusively create coverage but was used as a factor to in determining whether it existed); see also Kilgore v. Resumix, 1998 Mass. Super. LEXIS 170.

In this case, SGA is not the insurer of ADPM, but instead entered into an agreement that, effectively, requires SGA to indemnify ADPM for SGA's negligence. SGA cannot reasonably conclude that the plaintiff's claims fell within the scope of the indemnity provision. The allegations in the Complaint do not relate to any services provided by SGA. In its Complaint, the plaintiff alleges that ADPM is responsible for deficiencies with the HVAC system and the windows and nothing more. See Complaint, ¶¶ 23 and 27.

The plaintiff's Complaint contains no language tending to suggest that SGA was responsible – either directly or indirectly – for the alleged deficiencies. See Complaint. In fact, the Complaint makes no mention of SGA, except to state that ADPM[1] contracted with SGA to provide architectural design services for the Project. See Complaint, ¶ 16. The plaintiff alleges that ADPM, not SGA, is liable for deficiencies in the windows and HVAC system and for its failure to correct them. See Complaint, ¶¶ 30, 31, 34, 35 and 38.

Further, both the Complaint and the Third-Party Complaint expressly allege that Allied Consulting Engineering Services, Inc. ("Allied") was responsible for the HVAC design services. See Complaint, ¶ 17; Third-Party Complaint, ¶ 7. In addition, the SGA Agreement specifically excludes HVAC from its scope. See Exhibit A. The alleged HVAC deficiencies referred to in the plaintiff's Complaint, therefore, do not arise out of

---

[1] The actual language of the complaint states that "Fluor" contracted with SGA to provide architectural design services for the Project. ADPM is a Fluor Daniel Company.

any act or omission of SGA and, therefore, do not fall within the scope of the contractual indemnity clause.

Finally, ADPM cannot compel SGA to defend it simply by notifying SGA of the claims by the plaintiff, as it did in its February 5, 2004, letter. See Boston Symphony, 545 N.E.2d at 1160. Nor can ADPM force SGA to defend it by bringing a third-party claim if, as explained above, the claims do not fall within the scope of coverage as outlined in the agreement between SGA and ADPM. For these reasons, ADPM's motion for summary judgment should be denied.

### B. The Indemnification Provision At Issue Violates M.G.L. c. 149, § 29C and Is Therefore Void.

MGL c. 149, § 29C provides that any provision in a contract for construction "which requires a subcontractor to indemnify any party for injury to persons or damage to property not caused by the subcontractor or its employees, agents or subcontractors, shall be void." The foregoing statute provides protection to subcontractors from indemnifying any party for injury or damage for which the subcontractor bears no fault. See Herson v. New Boston Garden Corp., 40 Mass. App. Ct. 779 (1997); Hufnagle v. J.M. Cashman, Inc., 1995 Mass. Super. LEXIS 660, at *11 (May 30, 1995) (finding that it would be "unfair and at odds with the public policy objectives underlying G. L. c. 149, 29C that a subcontractor who is not at fault should be required to defend a general contractor who may be at fault"). In Herson, a contractual indemnity extended to claims "by reason of any act, omission, fault or negligence" of the subcontractor. Id. at 782. Among the issues addressed was whether the provisions of G.L. c. 149, § 29C, which voids indemnity contracts that extend to damage "not caused" by a subcontractor, barred recovery under the indemnity agreement. Id. at 785. The court expressly held that

"nothing in the subject indemnity clause requires that indemnity payments be tendered unless and until it has been proven that the [indemnitor] caused the injury." Id. at 786. Thus, one cannot dispute that any indemnification obligation by SGA to ADPM would be void unless it requires a causal connection between the alleged loss and SGA's act or omission.

The indemnity provision in the SGA Agreement is void because it fails to limit SGA's liability to an injury or damage caused by SGA. The validity of the indemnity clause must be determined by focusing on the language of the clause rather than the facts of the case or the assessment of blame amongst the parties involved. See Harnois v. Quannapowitt Dev., Inc., 35 Mass. App. Ct. 286, 288-289 (1993)(finding that the indemnity clause was void because it required the subcontractor to indemnify the general contractor for an injury that the subcontractor did not necessarily cause). When the language of an indemnity clause is ambiguous or appears to be overly broad, it will be allowed to stand only if the clause is qualified by the phrase "to the fullest extent permitted by law." Compare Callahan v. A.J. Welch Equip. Corp., 36 Mass. App. Ct. 608, 611 (1994)(where court declared valid an indemnification clause that required the subcontractor to indemnify the general contractor for an injury that was not necessarily caused by the subcontractor or its employees, agents, or subcontractors due to a limiting provision "to the fullest extent permitted by law") with Harnois, supra (where court declared void a nearly identical indemnification clause that did not contain limiting provision).

The indemnity clause at issue is void because it contains overly broad language which violates M.G.L. c. 149, § 29C. Section 7.2.2 of the SGA Agreement, requires

8

SGA to indemnify for injury to or death of person or damages to or loss of property arising directly or <u>indirectly </u>out of the acts or omissions to act of SGA or its subconsultants. <u>See</u> Exhibit A, § 7.2.2. In violation of M.G.L. c. 149, § 29C, this indemnification clause requires indemnity "arising . . . indirectly . . . out of the acts . . . of SGA." Theoretically, SGA's mere presence at the site "allowing" something to happen could trigger this clause in violation of the statute. <u>See</u>, <u>e.g.</u>, <u>Harnois</u>, 35 Mass. App. Ct. at 288-289.

Even if the indemnification at issue was declared valid, the record is devoid of evidence establishing the necessary causal connection between the alleged loss and acts or omissions of SGA. Allied, not SGA, was responsible for the HVAC design engineering services. <u>See</u> Third-Party Complaint, ¶ 7. Likewise, the window deficiencies have been attributed to R & R Window Contractor Inc., not to SGA. <u>See</u> Exhibit F to Affidavit of Tom Hughes in Support of ADP Marshall's Motion for Summary Judgment as to the MDFA. Therefore, holding SGA responsible for indemnifying ADPM for property damage resulting from the acts or omissions of Allied or R & R Windows would violate M.G.L. c. 149, § 29C. Accordingly, summary judgment against ADPM should be entered pursuant to Fed. R. Civ. P. 56(b).

### C.     The Lack of Damage To Property Makes the Indemnity Provision Inapplicable.

ADPM's motion for summary judgment must also be denied for the independent reason that, if summary judgment is not warranted as a matter of law for SGA because the clause is void under M.G.L. c. 149, § 29C, genuine issues of material exist regarding the applicability of the indemnity clause. SGA's indemnity obligation required damage to or loss of property at the Project and also that the alleged loss occur during SGA's

performance of its services.  The plaintiff seeks relief not to repair damaged property but instead to improve property improperly constructed in the first instance.  The allegations set forth in the Complaint do not reference any actual property damage.  Instead, the plaintiff alleges that the Project was not designed and/or constructed properly.  Specifically, the plaintiff alleges deficiencies with windows and that the HVAC system was not property designed.  Improper design and/or functioning of property are not the equivalent of damage to or loss of property.  See Marcil v. John Deere Industrial Equipment Co., 9 Mass. App. Ct. 625 (1980); 2314 Lincoln Park West Condominium Association v. Mann, Gin, Ebel & Frazier, Ltd., 555 N.E.2d 346 (Ill. 1990); Lake Placid Club Attached Lodges v. Elizabethtown Builders, Inc., et al., 521 N.Y.S.2d 165 (N.Y. App. Div. 1987); Casa Clara Condominium Association, Inc. v. Charley Toppino & Sons, Inc., 629 So. 2d 1244 (Fla. 1993); Sandarac Association, Inc. v. W.R. Frizzell Architects, Inc., 609 So. 2d 1349 (Fla. App. 1992); Sensenbrenner v. Rust, Orling & Neale, Architects, Inc., et al, 374 S.E.2d 55, 58 (Va. 1988).

**D.    The Lack of Damage or Loss During Performance of Services Makes the Indemnity Provision Inapplicable.**

The indemnity only applies to "claims . . . arising out of or relating to . . . damages to or loss of property . . . during the performance of Services . . . ."  The Complaint alleges that the loss occurred after SGA's performance of services was completed.  Thus, summary judgment in favor of SGA is warranted because ADPM cannot establish that the alleged loss for which the plaintiff seeks recovery occurred "during the performance of Services."

SGA's scope of services was to provide ADPM with architectural drawings for the core and shell of the Project.  SGA completed the architectural drawings sometime in

December 2000.  SGA also conducted periodic site visits during construction and until
the Project was occupied.  <u>See</u> Exhibit B, ¶ 4.  The Project was substantially complete on
or about August 20, 2001 and was occupied in December 2001.  <u>See</u> Complaint, ¶¶ 21,
22.  The alleged loss began after the Project was occupied.  <u>See</u> Complaint, ¶¶ 23, 27.
Therefore, the alleged loss did not occur during SGA's performance of services.  Because
there was no damage to or loss of property and the alleged loss did not occur during
SGA's performance of service, the plaintiff's allegations do not fall within the scope of
the indemnification clause.  Accordingly, SGA is not liable to ADPM for
indemnification.

     **E.**     **No Rational or Just Reading of the Indemnity Provision Can Require
Defense and Indemnity for Claims Outside of SGA's Responsibility.**

ADPM makes the argument that SGA owes it complete defense in a case that has
nothing to do with SGA.  In effect, ADPM is arguing that if one minor issue related to the
architect can be identified in the plaintiff's claim, SGA should fully defend and
indemnify ADPM for ADPM's and ADPM's subcontractors deficient design and
construction.  No case does or can support the argument that by agreeing to indemnify
ADPM for SGA's deficiencies, SGA has agreed to indemnify ADPM for its own
deficiencies as well as everyone else's.  No reasonable reading of the SGA Agreement
can support the arguments ADPM is making.  Accordingly, ADPM's motion must be
denied.

11

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Spagnolo/Gisness & Associates, Inc. requests that

ADP Marshall, Inc.'s Motion for Summary Judgment be denied in all respects.

Respectfully submitted,
SPAGNOLO GISNESS &
ASSOCIATES, INC,
By its attorneys,

David J. Hatem, BBO # 225700
Warren D. Hutchison, BBO #246150
Carly B. Goldstein, BBO #654731
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

## CERTIFICATE OF SERVICE

I, Warren D. Hutchison, Esquire, hereby certify that on this 14 day of June, 2005, I served the attached *Opposition to the Third-Party Plaintiff's Motion for Summary Judgment Against Spagnolo/Gisness & Assocaites, Inc.* by mailing a copy thereof, postage pre-paid to:

Andrew J. Tine, Esquire
Haese, LLC
70 Franklin Street, 9th Floor
Boston, MA  02210

John J. McNamara, Esquire
Domestico, Lane & McNamara, LLP
161 Worcester Road
Framingham, MA 01701

Edward F. Vena, Esquire
Vena, Riley, Deptula, LLP
250 Summer Street, 2nd Floor
Boston, MA  02210

Charles A. Plunkett, Esquire
Vena, Riley, Deptula, LLP
250 Summer Street, 2nd Floor
Boston, MA 02210

Dwight T. Burns, Esquire
Domestico, Lane & McNamara, LLP
161 Worcester Road
Framingham, MA 01701

Allen Whitestone
Black Cetkovic & Whitestone
200 Berkeley Street
Boston, MA 02116

Edward Coburn, Esquire
Taylor, Duane, Barton & Gilman, LLP
111 Devonshire Street
Boston, MA 02109

James J. Duane, Esquire
Taylor, Duane, Barton & Gilman
111 Devonshire Street
Boston, MA 02109

Warren D. Hutchison

00923883

13

# **EXHIBIT A**

Project No.: __110095.01__
Contract No.: __110095.01-01__

Case 1:04-cv-10203-PBS    Document 128    Filed 06/1?/2003    Page 1 of 30    Vendor No. ____

Consultant Phone No. __(617) 443-0680__

Cost Code No(s).  8-01-300-0000 - $114,000.00
                  8-01-200-0000 - $  5,000.00

# ADP MARSHALL, INC.
### A FLUOR DANIEL COMPANY
**75 Newman Avenue
Rumford, Rhode Island 02916
(401) 438-3500**

# CONSULTANT AGREEMENT

Project Title:          __Advanced Technology Manufacturing Center, Fall River, MA__

Owner:                  __Massachusetts Development Finance Agency__

Architect/Engineer:     __ADP Marshall, Inc.__

Contract Price:         __$119,000.00__

Date of Contract:       __June 27, 2000__

This Agreement is made effective as of the date stated above by and between **ADP Marshall, Inc.**, a corporation licensed to practice professional design and related services in the State of Massachusetts with its principal place of business as stated above (hereinafter "Company") and **Spagnolo/Gisness & Associates**, a corporation licensed to provide professional design and related services in the State of Massachusetts with a principal place of business at 200 High Street, Boston, MA 02110 (hereinafter the "Consultant").

Whereas, Massachusetts Development Finance Agency (hereinafter the "Owner") has entered into a prime agreement with ADP Marshall, Inc., whereas ADP Marshall, Inc. acts to provide professional design and related services in support of the Owner's Project as stated above (the "Project") to be located at Fall River, MA (the "Site"); and

Whereas Company and Consultant wish to enter into this Consultant Agreement to complete the design requirements for a portion of the Project to the extent as described in Attachment "A" set forth herein below.    In consideration of the mutual promises contained herein, Company and Consultant hereby agree as follows:

1.      **DEFINITIONS**
1.1     **Agreement Documents** - Collectively, this Consultant Agreement, all Attachments hereto and documents incorporated herein by reference constitute the "Agreement Documents." The terms of this Consultant Agreement shall control in the event of a conflict with other Agreement Documents, including any conflicting commercial terms and/or payment provisions stated in the Attachments . The Agreement Documents shall supersede all proposals, offers and/or counter offers between the parties except to the extent that may be expressly incorporated herein. Attachments included in the Agreement Documents may include the following:

Attachment "A" - Scope of Consultant's Services and Milestone Dates
Attachment "B" - Schedule of Fee Payments (Not Applicable)
Attachment "C" - Invoicing Format
Attachment "D" - Consultant's Hourly Rates for Extra Services (See Attachment "A")

1.2     **Basic Design Documents** - *"Basic Design Documents"* means those documents prepared by the Company that have been provided to Consultant for purposes of carrying out the design and related services as defined herein.
1.3     **Services** - *"Services"* means the services to be performed by the Consultant as described in and reasonably inferable from the Agreement Documents as described in Section 1.2 above.
1.4     **Extra Services** - *"Extra Services"* means those services, if any, in addition to the Consultant's initial scope of Services described in Section 1.3 above that have been mutually agreed to by the parties and are performed by the Consultant after receipt of Company's prior written approval.
1.5     **Reimbursable Expenses** - *"Reimbursable Expenses"* means those expenses enumerated in Section 6.3 of this Agreement that may be reimbursable to the Consultant while performing Services.

**Page 1 of 9**


MGM


CON

1.6 **Sub-Consultants** - The term *"Sub-Consultants"* shall mean independent design professionals performing the Services that have been approved in advance and in writing by Company. All references to the Consultant's Sub-Consultants herein shall be inclusive of their respective sub-consultants of any tier.

1.7 **Contract Documents** - The *"Contract Documents"* shall be the drawings and specifications that are prepared by the Consultant and its Sub-Consultants as part of its Services and have been accepted by the Company.

1.8 **Prime Agreement** - The *"Prime Agreement"* is the separate agreement entered into between the Owner and ADP Marshall, Inc. for professional design and related services for the Project.

1.9 **Work** - *"Work"* means the services performed by ADP Marshall, Inc. pursuant to the Prime Agreement in implementing the project.

2 **CONSULTANT'S SCOPE OF SERVICES**

2.1 **Representations**

2.1.1 Consultant shall perform all of the design and related Services that are specified or reasonably inferable from the requirements set forth in the Agreement Documents, including Attachment "A" and this Article 2. As further described in the Attachment "A" hereto, the Consultant's Services shall be performed in phases (*"Phases"*) with milestone completion dates (*"Milestone Dates"*) as described therein.

2.1.2 Consultant acknowledges and agrees that, notwithstanding that the Company will remain as the design professional of record for the Project, Consultant is responsible for completing all of its Services, including preparation of any Contract Documents within its Services, in a manner that complies with all requirements of the Prime Agreement and the Agreement Documents. Consultant confirms that it has reviewed the applicable requirements of the Prime Agreement as designated by the Company and hereby confirms that all such requirements are deemed incorporated by reference into the Agreement Documents. Consultant further confirms that all such requirements of the Prime Agreement shall be included within any Contract Documents prepared by Consultant and otherwise complied with as part of the Services.

2.1.3 Consultant's Services shall be carried out by personnel who are experienced, skilled and competent in their respective areas of expertise. Consultant represents that it is duly licensed (both business and professionally) and legally authorized to perform the Services contemplated by this Agreement in the State of Massachusetts and undertakes to furnish its best skill and judgment and to cooperate with Company in furthering the best interests of Owner, Company, and the Project.

2.1.4 Consultant agrees that all Services performed hereunder, shall be in compliance with all applicable local, state and federal laws, regulations, restrictions and requirements of all governmental and quasi-governmental authorities, utility companies, fire underwriters and other agencies and organizations having jurisdiction over the Services, including all local building and safety requirements. It is provided, however, that Consultant shall not enter into negotiations with any governmental authority or agency without obtaining Company's prior written consent.

2.1.5 Consultant undertakes to provide Company with detailed designs, Contract Documents, construction observation services, and other services suitable for their intended purpose. Such Services shall be completed in a timely manner, and to the extent necessary to enable Company to achieve completion of Project in accordance with the mutually agreed completion dates, including any Milestone Dates set forth in Attachment "A" hereto.

2.1.6 The Contract Documents prepared by the Consultant shall be fully coordinated with all other Contract Documents on the project whether prepared by the Consultant, the Company, or by another consultant. This shall include the integration of the design requirements contained in the Company's Basic Design Documents, the design requirements contained in the Prime Agreement, information developed and provided by the Consultant and its Sub-Consultants, and any supplemental design information provided from time to time by the Company.

2.1.7 Consultant shall not: (a) undertake any activity or employment; or (b) have any significant undisclosed financial or other interests; or (c) accept any contributions, if it would reasonably appear that such activity, employment, interest or contribution could compromise the Consultant's professional judgment or prevent the Consultant from serving the best interests of Owner, Company, and the Project.

2.1.8 Consultant acknowledges that it has provided services to Company at its best corporate rates.

2.2 **Consultant's Personnel**

2.2.1 William Gisness will be Consultant's Principal in charge of all Services to be performed by Consultant under the terms of this Agreement and shall be authorized to act on Consultant's behalf with respect to Services. All decisions, notices and directives issued by Consultant's Principal shall be binding upon Consultant with respect to this Agreement.

2.2.2 Consultant's personnel categories and hourly rates set forth in Attachment "D" hereto are approved by Company to be utilized by Consultant when performing Extra Services on a "Time and Expense" basis pursuant to Section 6.2 below. As a condition of Company's duty to pay for any Extra Services, Consultant agrees to identify in advance and obtain Company's prior written approval for all personnel to be used for each Extra Service assignment as well as any and all additional personnel categories, if any, that Consultant may wish to use in carrying out any approved Extra Services hereunder. Rates charged by Consultant's Sub-Consultants for each Extra Service assignment performed on a Time and Expense basis shall in no case



MGM   CON

2.2.3    exceed the rates set forth in Attachment "D" and shall also require Company's written approval prior to commencing performance of any Extra Services.

2.2.4    Consultant accepts sole responsibility for the accuracy and adequacy of its design, status reports and the Contract Documents prepared by its employees and Sub-Consultants performing the Services. This shall include responsibility for compliance with all applicable codes and other legal regulations, the checking and approval of all shop drawings, materials and samples as well as the adequacy of any tests conducted under the direction of the Consultant that are required within the Scope of Services set forth in this Agreement.

2.2.5    Except for those independent Sub-Consultants which have been identified in writing by Consultant and approved in writing by Company, Consultant confirms that all of its personnel are full time employees for purposes of reporting and paying federal income taxes, all federal and state payroll and social security taxes, unemployment taxes, workers' compensation and any and all similar taxes and social programs applicable to full time employees.

2.2.5    The assignment of all personnel engaged to perform Consultant's Services is subject to the approval of Company. Company may, for reasonable cause, require the removal or reassignment of particular members of Consultant's personnel.

2.3    **Coordination of the Services** - In carrying out its coordination responsibilities, Consultant agrees to continuously coordinate its activities with the Company, and Company's other Consultants. This shall include taking all steps reasonably necessary to assure that all Services performed by Consultant hereunder are completed in a timely manner without causing delay, hindrance or interference with the activities of the Company, or Company's other Consultants.

2.4    **Examination for Conflicts** - Upon receipt of the Basic Design Documents from Company, Consultant shall promptly use due diligence in reviewing such documents to ascertain the existence of any errors, discrepancies, omissions, duplication or conflicts within the Basic Design Documents and between the Basic Design Documents and the requirements of the Prime Agreement. If Consultant discovers or otherwise becomes aware of any such errors, discrepancies, omissions, duplications or conflicts during such initial examination, or at any time during the course of the Work, Consultant shall immediately notify Company in writing and obtain written instructions from the Company before proceeding with any part of the Services affected thereby. If Consultant performs any Services relating to any such errors, discrepancies, omissions, or duplications, except in accordance with such written instructions obtained from Company, Consultant shall bear all costs of correction and adverse scheduling impacts attributable thereto.

2.5    **Permits and Licenses** - Consultant shall, without additional compensation, keep current all governmental permits (other than Building Permits), certificates and licenses (including professional licenses) necessary for Consultant to perform its Services.

2.6    **Inspection and Access** - Company shall at all times have access to the Consultant's work product developed under this Agreement wherever in preparation, and Consultant shall facilitate such access and the inspection thereof. Any review, inspection, lack of inspection, approval or acceptance by Company shall not be deemed to be a waiver of any of its rights relating to Consultant's performance standards and/or indemnification responsibilities contained herein, or of Company's right to subsequently reject defective Services.

2.7    **Monthly Reports** - Consultant shall submit a detailed activity report to Company not less than once a month describing the progress of the Services, including the status of Consultant's progress in meeting any mutually agreed Milestone Dates set forth in Attachment "A".

2.8    **Minutes of Meetings** - Consultant shall routinely and promptly provide minutes of all meetings attended by the Consultant during the performance of the Services.

2.9    **Limitations of Consultant's Responsibilities**

2.9.1    Notwithstanding anything in this Agreement which may indicate otherwise, Consultant shall not be deemed to have control over or be in charge of acts or omissions of Company or its other design consultants or the Owner, or its subcontractors, vendors or their respective agents or employees, or of any other persons performing portions of Work on behalf of the Owner.

2.9.2    Nothing contained in this Consultant Agreement or the Prime Agreement shall establish privity of contract or create third party beneficiary rights between the Consultant and the Owner; or between the Consultant and any subcontractors or vendors to the Owner pursuant to the Prime Agreement; or between the Consultant and any of Company's other independent consultants.

2.9.3    Notwithstanding anything which may appear to the contrary in the Agreement Documents, the parties do not intend and the Consultant's Services shall not be construed as providing any legal services, representation, or opinions on any matters of law.

3    **STANDARDS AND REMEDIES**

3.1    **Standards of Performance** - Consultant shall perform its Services expeditiously and in accordance with the highest prevailing standards of professional care for nationally recognized architects and registered engineering professionals regularly engaged in the design of state of the art Project described herein. Notwithstanding any review, approval, acceptance, or payment for any and all of Consultant's Services by the Company or termination of this Agreement, the Consultant shall remain responsible for the professional and technical accuracy of all of the Consultant's Services and deliverables in meeting the requirements described in this Consultant Agreement and the Prime Agreement.

3.2    **Company's Remedies** - In the event Consultant fails to perform any of its Services in a manner satisfactory to the Company and in accordance with the standards set forth in Section 3.1 above, Consultant shall perform again, at its

**Page 3 of 9**


MGM    CON

sole cost and expense, any and all of Consultant's Services that are defective as a direct or indirect result of such Cause. Consultant shall likewise be responsible for the additional personnel costs of the Company and Company's other consultants, if any, arising out of such defective Services. This paragraph does not limit Company's rights and remedies nor Consultant's liabilities for the Services performed pursuant to the terms and conditions of this Agreement.

## 4    COMPANY'S RESPONSIBILITIES

4.1    **Relevant Information** - To the extent relevant to the Consultant's Services and in Company's possession, Company shall provide Consultant with information including the following: (a) the latest Basic Design Documents required for completion of the Services; (b) any previous geotechnical surveys made available by Owner; (c) any reports made available by Owner or otherwise known to the Company describing known underground utilities, prior structure foundations or other obstructions which might hinder construction of the Project and/or impact performance of the Services; and (d) any reports made available by Owner or otherwise known to Company concerning the location and identity of any oil, hazardous, toxic, radioactive or asbestos materials in, on or near the Site. Consultant shall promptly report to Company any error, inconsistency or omission which it discovers in any such documents.

4.2    **Company's Authorized Representative** - Company has designated Robert Greetham as its Project Representative authorized to act on Company's behalf with respect to the Consultant's Services. Consultant shall submit its Contract Documents, reports, analyses and other documents to the Project Representative for review and comments. Any requests for Extra Services shall be submitted to the Project Representative for review and written approval prior to commencement. The Project Representative shall promptly render decisions as required, including issuing directives from the Company to facilitate the progress of the Services.

## 5    PERFORMANCE SCHEDULE

5.1    **Performance Schedule** - Except for the implementation of Article 9 below or unless otherwise agreed to by Company in writing, Consultant shall commence and complete the performance of its Services under this Contract in accordance with those dates as set forth in Attachment "A", unless a schedule extension has been approved by the Company.

5.2    **Timely Performance** - Consultant acknowledges that TIME IS OF THE ESSENCE and that Company's business interests will suffer substantial losses unless Consultant's Services are completed in a timely manner. Consultant's failure to timely complete its Services in accordance with Section 5.1 above shall be a material breach of this Agreement

## 6    COMPENSATION AND PAYMENT

6.1    **Fixed Fee** - In full consideration for the performance of the Services in strict accordance with the requirements of this Agreement, Company shall pay Consultant the lump-sum amount of as set forth herein above (the "Fixed Fee"), subject to the Owner's payment to the Company under the Prime Agreement. Subject to Extra Services which are mutually agreed to between the parties in advance and in writing, the Fixed Fee shall be Consultant's sole and total compensation for all costs, overheads and profit, including but not limited to all cost of all general conditions, insurance premiums, federal, state, and local statutory payroll and benefit taxes, income taxes and sales, use and excise taxes which relate to its Services hereunder. The Fixed Fee shall be allocated by Phases as set forth in Attachment "B".

6.2    **Compensation for Extra Services** - Subject to the Consultant's compliance with Article 10 below and to the extent approved in advance and in writing by Company, payment for Extra Services shall be computed on either: (a) a Time and Expense basis measured by the Schedule of Hourly Rates listed in Attachment "D", without mark-ups, plus Reimbursable Expenses directly related to the Extra Services, without mark-ups; or (b) on a lump sum basis as may be mutually agreed upon by the parties in advance and in writing. Lump-sum amounts for Extra Services shall be inclusive of all Reimbursable Expenses.

6.3    **Reimbursable Expenses** - Reimbursable Expenses shall be subject to the Owner's payment to the Company under the Prime Agreement and shall be limited to actual expenditures for the items listed below without mark-ups and which are incurred by the Consultant only during the direct performance of any Services performed on an Expense basis as follows:

6.3.1    Actual costs for transportation and travel expenses in connection with out-of-town travel authorized by Company, in accordance with Attachment "A" and with automobile mileage rates for out of town travel not exceeding the IRS accepted rate per mile;

6.3.2    Long distance telephone calls at actual cost;

6.3.3    Facsimile transmission costs at One Dollar ($1.00) per page within the U.S. and Two Dollars ($2.00) per page outside the U.S., and with no charges for incoming facsimiles;

6.3.4    Fees approved by Company and paid by Consultant for securing approval of authorities having jurisdiction over Consultant's Services provided;

6.3.5    Photocopy reproductions at rates not exceeding ten cents ($0.10) per copy;

6.3.6    Postage, shipping and air courier costs at actual cost; and

6.3.7    Expense of overtime hours requiring higher than regular rates, when authorized in advance and in writing by Company.

Note: Reimbursable Expenses relating to Consultant's Services shall not in any event exceed the pre-approved amount without the Company's Project Representative's prior written consent.

MGM    CON

6.4 **Progress Payments** - Consultant shall submit monthly Applications for Progress Payments in accordance with the invoicing formats set forth in Attachment "C" that separately itemize the following:

    6.4.1 The relevant Fixed Fee progress payment due in accordance with Attachment "B" - Schedule of Fee Payments.

    6.4.2 Separate line item entries that identify all Extra Services which were approved in advance and in writing by Company and which were completed during the preceding month. Consultant's submittal for these extra costs shall include a copy of Company's prior written approval for each item of Extra Services. Except for Extra Services performed on a mutually agreed lump-sum basis, Consultant shall also submit: (a) time sheets signed by Consultant's Representative on a daily basis which identify Consultant's personnel by name, their Hourly Rates as specified in Attachment "D" and the number of hours worked on each separate item of approved Extra Service; and (b) an itemization of all Reimbursable Expenses attributable to each separate item of Extra Service performed and incurred during the preceding month.

6.5 **Monthly Payments** - Within thirty (30) days after receipt of approved Consultant's Application for Progress Payment in compliance with the requirements of Section 6.4 above and subject to the applicable payment from the Owner that includes payment for the Consultant's Services then payable, Company shall pay the amounts approved in accordance with this Article 6 without retention, including Fixed Fee progress payments and amounts for Extra Services during the preceding month, if any.

6.6 **Final Payment** - Final payment shall be made within thirty (30) days of the satisfactory completion of Consultant's Services hereunder subject to the applicable payment from the Owner that includes the amounts attributable to final payment for the Consultant's Services.

## 7   INDEMNIFICATION

7.1 **Indemnified Parties** - The term *"Indemnified Parties"* means Company, Owner, and each of their respective subsidiary companies, affiliated companies and parent companies of every tier, and each of its directors, officers, employees, agents, representatives and assignees permitted herein.

7.2 **Consultant's Duty to Indemnify** - Consultant shall defend, indemnify and hold each of the Indemnified Parties harmless from and against any claims, demands, causes of actions, damages, liabilities, losses, costs and expenses, including reasonable attorneys' fees, arising out of or relating to:

    7.2.1 Actual or asserted infringement, improper appropriation, or use of trade secrets, proprietary information, copy rights, or patents; and

    7.2.2 Injury to or death of persons (including the employees of the Indemnified Parties, Consultant and its sub-tier consultants) or damages to or loss of property (including the property of the Indemnified Parties, Consultant and its sub-tier consultants) arising directly or indirectly out of the acts or omissions to act of Consultant or its sub-tier consultants, or their respective employees or agents, or others for whom the Consultant is legally liable, during the performance of the Services; and

    7.2.3 Failure by Consultant to comply with any applicable law, regulation, or statute, or with the terms of this Agreement.

7.3 **Defense Costs** - Consultant's defense and indemnity obligations shall include the duty to reimburse any attorneys' fees and expenses incurred by Company or Owner for legal actions to enforce the Consultant's indemnity obligations.

## 8   INSURANCE

8.1 **Limitations** - Commencing with the performance of the Services hereunder, Consultant shall provide, pay for and maintain in effect the following types and minimum amounts of coverage for the full duration of this Agreement. All such insurance provided by Consultant shall be primary insurance and shall not be considered contributory insurance with any insurance policies of Company or any of the other Indemnified Parties.

    8.1.1 Worker's Compensation Insurance System coverage in accordance with the laws of the State of which the Project is located in or worker's compensation or similar laws of the state, territory, province, or political subdivision having jurisdiction over the employee, and Employer's Liability coverage with a minimum limit of liability of $1,000,000 for each occurrence.
    This coverage must include:
    (a)    Coverage for all states in which operations are conducted; and
    (b)    Policy must be endorsed to provide sixty (60) days' notice of cancellation to Company.
    Employer's Liability coverage must include:
    (a)    $1,000,000 bodily injury for each accident;
    (b)    $1,000,000 bodily injury by disease for each employee; and
    (c)    $1,000,000 bodily injury by disease aggregate.

    8.1.2 Automobile Liability Insurance covering use of all owned, non-owned, and hired vehicles with a minimum combined single limit of liability of not less than One Million Dollars ($1,000,000) per occurrence for bodily injury and property damage. This policy shall be endorsed to name Company and all other Indemnified Parties defined in Section 7.1 above as additional insureds.

    8.1.3 Commercial General Liability Insurance on an occurrence basis covering bodily injury and property damage (including the property of the Indemnified Parties) with minimum limits of Two Million Dollars ($2,000,000) combined single limit, with blanket contractual liability coverage, completed operations, independent


MGM


CON

contractors, broad form property damage, personal and advertising injury, cross-liability and severability of interests. This coverage must included the following:

    (a) Policy to be endorsed to provide aggregate limits "per project" and "per location";

    (b) Policy must name Company and all of the other Indemnified Parties defined in Section 7.1 above as Additional Insureds on a primary basis;

    (c) Coverage for the full limits required must be primary to any coverage purchased by or maintained by or on behalf of the Additional Insureds; and

    (d) Policy must be endorsed to provide thirty (30) days' notice of cancellation to Company.

8.1.4 Professional Liability Insurance naming Consultant as the insured in an amount of not less than One Million Dollars ($1,000,000) for each claim with an annual aggregate of Two Million Dollars ($2,000,000) per project, which shall include the coverage for attorney fees and investigation. The policy shall be subject to Company's review and approval and cover all aspects of the design of the Project that are within Consultant's Scope of Services. Such policy shall cover claims on a "claims made" basis arising out of any act or omission of Consultant, its employees and Sub-Consultants and of any other person for whose acts or omissions Consultant is legally responsible for that occur during performance of Services in a professional capacity. If Consultant should terminate such coverage at any time before three years (3) after acceptance or termination of Consultant's Services, Consultant shall obtain Extended Reporting Period Coverage ("tail cover"), for a period of not less than three years (3) from the date of Consultant's last Services.

8.1.5 Valuable Papers Insurance in an amount sufficient to cover the restoration of all documents, analyses and reports prepared by the Consultant pursuant to this Agreement, including plans, drawings, specifications, Construction Documents, computer files and other related documents in the event of loss or destruction. This policy shall be endorsed for coverage to be on a per project basis and to name Company and the Indemnified Parties defined in Section 7.1 above as additional insureds.

8.2 **Waiver of Subrogation** - Consultant shall obtain and provide waivers of subrogation against Company and all other Indemnified Parties as named in Section 7.1 above and their respective officers, affiliates, employees, directors, and agents, under Consultant's insurance coverage provided pursuant to this Article. Evidence of such waiver satisfactory in form and substance to Company shall be stated in the Certificates of Insurance provided pursuant to Section 8.4 below.

8.3 **Other Provisions** - The coverage's required above as well as any other coverage that Consultant may consider necessary are the Consultant's sole responsibility and shall not affect Consultant's liability as stated in this Agreement, including any deficiency in the coverage or policy limits. The cost of all premiums and deductibles shall be for the account of the Consultant and not subject to reimbursement by Company. All deductibles and self-insured retention amounts must be acceptable to and approved in writing by Company.

8.4 **Certificates of Insurance** - When required to be obtained by Consultant, policies required in this Article 8 shall be placed with insurance companies having an A.M. Best Company rating of A or better, are licensed to do business in the State which the Project is located and are otherwise acceptable to Company. Before commencing performance of the Services, Consultant must furnish Certificates of Insurance in a form satisfactory to Company. Certificate shall include all endorsements specified in this Article 8 and evidence all insurance required pursuant to this Article 8 are in force. Such Certificates for each policy shall include the following information:

8.4.1 State the effective expiration dates of the above policies;

8.4.2 Provide that not less than thirty (30) days' written notice will be given to Company prior to any cancellation, non-renewal or restrictive modification being made to any of the policies and state that a waiver of subrogation endorsement has been attached to all policies;

8.4.3 Provide full disclosure of any deductibles and/or self-insured retention;

8.4.4 State that Consultant's policies are primary to policies provided by Company and the Indemnified Parties and list Company and all other Indemnified Parties as additional insured on all coverage's except for Worker's Compensation Insurance System and Automobile Liability Insurance;

8.4.5 State exclusions to the policies that are not part of standard form coverage;

8.4.6 Show Company (at address stated above) as the Certificate Holder and shall be delivered to:

    Attn: Ms. Pamela Paradis
    ADP Marshall, Inc.
    75 Newman Ave.
    Rumford, RI 02916

    With copy to:

    Company's Project Representative
    ADP Marshall, Inc.
    75 Newman Ave.
    Rumford, RI 02916




MGM    CON

**9**    **CANCELLATION, TERMINATION AND SUSPENSION**

9.1    **Suspension of the Services** - Company may, by written notice to Consultant, suspend further performance of the Services and later may, by written notice to the Consultant, withdraw all or part of the suspension. Any proposed changes to the scheduled time of completion of the Services resulting from said suspension must be submitted by Consultant to Company in accordance with the provisions of Article 10, Claims.

9.2    **Cancellation for Convenience** - Company shall have the unrestricted right to cancel the performance of all or any part of the Services by written notice. In such case, Consultant shall immediately discontinue performance of the Services on the date specified in such notice, and shall preserve its work in progress pending disposition instructions by Company. Consultant shall recover from Company the actual costs of all Services satisfactorily performed prior to the date of cancellation as full payment for such cancelled Services, subject to provisions of Section 6.5 of this Agreement. Consultant hereby waives any and all claims for anticipated profits, lost overheads and/or other consequential costs arising out of any cancellation.

9.3    **Termination for Cause** - In the event that Consultant defaults in the performance of any obligation to be performed by it under this Agreement and shall fail to correct such default within five (5) working days after written notice thereof from Company, Company may, without prejudice to any other rights or remedies Company may have, hold in abeyance further payments to Consultant and/or terminate this Agreement by written notice to Consultant specifying the date of termination. In the event of such termination, Company may take over and finish the Services by whatever method Company may deem expedient at Consultant's sole expense.

**10**    **CLAIMS**

10.1    **Timely Notice Requirements** - Consultant shall give Company written notice entitled *"Notice of Claim"* not later than within three (3) working days after any occurrence of an event being relied upon by Consultant as the basis for Consultant's *"Claim"*. Such Notice shall state whether the Consultant is seeking an increase in the Fixed Fee or an increase in the time of performance set forth in Section 5.1 above, or both.

10.2    **Timely Submittal Requirements** - Within ten (10) working days after the occurrence of the event being relied upon by Consultant as the basis for its Claim, Consultant shall provide Company with a written statement describing all relevant facts and contractual provisions supporting the Consultant's Claim in detail. Consultant's submittal must include Consultant's detailed estimate of extra lump-sum costs or costs on a Time and Expense basis pursuant to Section 10.3 below and/or the increase or decrease in the scheduled time of performance of the Services resulting therefrom pursuant to Section 10.4 below.

10.3    **Time and Expense Extra Work** - Company may in its sole discretion direct that any proposed Extra Services be performed on a Time and Expense basis. In all cases where Company has advised Consultant that any proposed Extra Work will be performed on a Time and Expense basis, Consultant's submittal shall include the proposed names and all-in hourly rates of Consultant's personnel that will perform the Extra Services.

10.4    **Claims for Additional Time** - In the event that Consultant submits a Claim for a time extension, Consultant shall have the full burden of providing detailed narratives and CPM analyses that establish any such delays were solely caused by improper acts or omissions by the Owner or Company, or by reason of circumstances between the control of the parties. Claims for additional time shall include all detailed CPM analyses as may be required, in Company's reasonable opinion, to support the Claim. Consultant's only right, and Company's only liability, with respect to delays shall be an extension of time equal to the number of days of the delay, and Consultant expressly waives any right to claim additional compensation in the event of any such delays in providing the Services.

10.5    **Waiver of Claim Rights** - Consultant understands that its rights to pursue increases in the Fixed Fee and/or additional time for completion of its Services as contemplated in this Article 10 are strictly dependent upon the Consultant's compliance with the timely notice requirement of Section 10.1 and the submittal requirements of Sections 10.2, 10.3 and 10.4. Any failure to timely comply with Sections 10.1 and 10.2 or to timely supply Company with the substantiation information required by Sections 10.3 and 10.4 above shall constitute a full waiver and release by Consultant of its rights to pursue Claims relating to the Services.

10.6    **Evidence of Settlement** - Notwithstanding any negotiations, or purported verbal agreements or assertions of waivers of contractual rights between the parties, Company shall not be responsible for any adjustments in the Fixed Fee or the Consultant's time of performance unless agreed to in writing by Company. To have any force or effect, all agreements relating to extra costs and/or increases in the time of performance must be mutually agreed to by the parties and evidenced by a "Change Order" document signed by both parties.

10.7    **Uninterrupted Prosecution of the Services** - Notwithstanding anything in this Agreement that might indicate otherwise and regardless of whether or not a Claim is unresolved or disputed, the Consultant shall in no case halt or suspend all or any part of the Services without Company's prior written consent. Unless so agreed to in writing by Company, Consultant shall remain bound to perform the Services pursuant to the requirements of this Agreement, without delay, and to achieve the successful and timely completion of the Services.

**11**    **COMPANY'S AUDIT RIGHTS** - Consultant shall maintain, and require its employees and agents and all others for whom the Consultant is legally liable under this Agreement to maintain, detailed records and accounts pertaining to all of its Services, including Extra Services, Reimbursable Expenses and personnel hours expended during the course of such Services and for a period of at least two (2) years after receipt of final payment. Such financial records shall be kept in accordance with generally accepted accounting principles and shall be made available to Company, Owner and their respective authorized representatives for purposes of inspection, copying and audit promptly after receipt of

MGM    CON

written notice from Company it is provided, however, that such collateral shall not extend to those Services performed solely on a lump-sum basis unless such lump-sum Services have, in Company's reasonable opinion, a direct and proximate relationship to any pending Claim by Consultant for additional compensation and/or additional time for completing performance, or an action by Company based upon material breach of contract by Consultant in fulfilling its scope of Services as a whole.

## 12   GENERAL PROVISIONS

12.1    **Assignment and Subcontracting** - This Agreement is personal to the Company and Consultant. Consultant shall not subcontract or assign the performance of any portion of these Services without the prior written consent of Company. Any purported assignment by Consultant without such consent shall be null and void. Consultant hereby agrees that Company may assign this Agreement to Owner or Owner's designated representative.

12.2    **Propriety Information** - Company considers all information pertaining to the Services or the Project to be confidential and proprietary unless otherwise stated to Consultant in writing. Consultant shall refrain from disclosing any such information without Company's prior written consent, including any information that is prepared or developed by or through Consultant, Company or Company's other Project Consultants or Sub-Consultants of any tier.

12.3    **Ownership and Use of Consultant's Documents** - All documents prepared by Consultant as part of the Services, including all original reports, drawings, renderings, specifications, estimates, field notes and similar data prepared by Consultant in furtherance of the Services shall be the property of Company. Consultant hereby assigns to Company all documents prepared by Consultant, its employees and agents, or others for whom the Consultant is legally liable under this Agreement, including all copyright rights. At the time of completion, or upon an earlier cancellation or termination of this Agreement, Consultant shall promptly on demand turn over to Company the originals of all such documents. Consultant agrees to execute all documents and to take all steps that Company deems necessary or desirable to protect Company's ownership and property rights of these materials. Consultant may retain one (1) set of reproducible copies thereof for information and reference purposes only.

12.4    **Advertising and Promotional Materials** - Consultant hereby agrees not to publish or use the name of the Owner, Owner's premises, or any variation thereof, or the name "ADP Marshall, Inc.", or any logos used by Owner or Company in connection with any of Consultant's business operations, promotional materials, press releases without the advance written approval of both the Owner and Company. All requests for approval for promotional purposes will be submitted to Company for further handling.

12.5    **Independent Contractor** - Consultant shall at all times be an independent contractor and have sole responsibility for and control over all means, methods, techniques, sequences and procedures for coordinating and scheduling its Services to achieve the requirements of this Agreement. Nothing in this Agreement shall be deemed to imply or represent that the Consultant, its employees and agents, or others for whom the Consultant is legally liable under this Agreement are the agents, representatives or employees of Company or other Indemnified Parties. Consultant further agrees that it will be solely responsible for the payment of all taxes and social benefits required by law to be paid for or on behalf of its employees, agents and representatives.

12.6    **Resolution of Disputes**

12.6.1    *Disputes Not Involving the Owner* - All claims, disputes and other matters in question arising out of or relating to this Agreement or the breach thereof, and not involving the Owner, shall be decided by a court of competent jurisdiction in the State of Massachusetts and not by arbitration unless the parties mutually agree otherwise. The existence of any claim, dispute, arbitration or judicial proceeding shall not relieve Consultant from its obligation to properly perform its Services as set forth herein. Neither party shall initiate a judicial proceeding, and the applicable statute of limitations shall not commence to run, until the date of substantial completion of Consultant's Services or any termination of this Agreement, whichever occurs first. Consultant hereby knowingly, voluntarily and intentionally waives (to the extent permitted by applicable law) any right it may have to a trial by jury of any dispute arising under or relating in any way to this Agreement and agrees that any such dispute may, at Company's option, be tried before a judge sitting without a jury.

12.6.2    *Disputes Involving the Owner - Mandatory Arbitration*

12.6.2.1    In the event that the Company is required to be a party to an arbitration that is directly or indirectly relevant to any dispute with Consultant, Consultant hereby agrees that Company may at their election notify Consultant in writing that any such dispute shall be subject to the binding arbitration provisions set forth in the Prime Agreement. In such event, the parties shall be bound to reach a full and final resolution of such disputes pursuant to the arbitration provisions in the Prime Agreement and without regard to Subsection 12.6.1 above.

12.7    **Governing Law** - The laws of the State of Massachusetts shall govern the validity, construction, performance and effect to this Agreement.

12.8    **Binding Effect** - Company and Consultant, respectively, bind themselves and to the extent applicable, their partners, successors, assigns and legal representatives to fulfill all obligations contained in this Agreement. The provisions of this Agreement that by their nature are intended to survive the termination, cancellation, completion or expiration of this Agreement shall continue as valid and enforceable obligations of the parties notwithstanding any such termination, cancellation, completion, or expiration.

12.9    **Enforceability** - The invalidity or non-enforceability of any provision of the Agreement shall not impair or affect the validity or enforceability of any other provisions. In the event that any one or more provisions are determined to be unenforceable or void, the remainder of the Agreement shall remain in full force and effect. In the event of a waiver or

MGM    CON

series of waivers by either party of a breach or default of any provision of this Agreement. Such waiver(s) shall not constitute or be evidence of a waiver of any future breach or default of the same provision or any other provisions.

13    **NOTICES** - All notices relating to termination, cancellation for convenience, suspension or material breach shall be sent to the parties at the addresses stated below, by registered or certified mail. All other notices may be sent by regular mail. Notice by facsimile transmissions shall be effective upon receipt, but must be confirmed by registered, certified or regular mail, as is appropriate to the type of notice. Either party hereto may specify to the other party a different address for the giving of notices.

13.1    **Notices to Company** - All notices to Company shall be sufficient when sent as stated above and addressed as follows:

    ADP Marshall, Inc., Attn: Mr. Rob Greetham
    75 Newman Ave.
    Rumford, RI 02916
    Facsimile No. 401/438-2202

13.2    **Notices to Consultant** - All notices to the Consultant shall be sufficient when sent as stated above and addressed as follows:

    Spagnolo/Gisness & Associates
    Attn: Mr. William Gisness
    200 High Street
    Boston, MA 02110
    Facsimile N. (617) 443-0689

14    **ENTIRE AGREEMENT** - This Agreement represents the entire and integrated agreement between Company and Consultant and supersedes all prior negotiations, representations or agreements, whether written or oral. This Agreement shall not be changed or modified except by written amendment signed by officers of the parties.

15    **ACKNOWLEDGMENTS** - The parties acknowledge and agree that the terms and conditions of this Agreement, including but not limited to those relating to waivers, allocations of and releases from indemnities against and/or limitations of liability, have been clearly identified and freely, fairly and thoroughly negotiated by mutual agreement so that both parties have actual knowledge of the intent and effect of such terms and conditions. Each party acknowledges that in executing this Agreement, they rely solely on their own judgment, belief and knowledge as well as such advice as may have been received from their respective attorneys and counselors. The parties further agree that no provision in this Agreement shall be interpreted for or against any party because that party, or its attorney, drafted the relevant provision.

    IN WITNESS WHEREOF, the Consultant and the Company have executed this Agreement by their duly authorized representative on the dates set below their names.

ADP MARSHALL, INC.            SPAGNOLO/GISNESS & ASSOCIATES

_____    By: _____
   Mark G. Magnan
   Purchasing Manager         Title: _____
                          PRINCIPAL
Date: __10/30/00__        Date: __9.26.2000__

                          State of Incorporation or Registration, if corporation
                          or partnership: __MASS.__

**Page 9 of 9**



# Scope of Work
## MASSACHUSETTS DEVELOPMENT FINANCE AGENCY
## ADVANCED TECHNOLOGY MANUFACTURING CENTER
## FALL RIVER, MA - JOB NO. 110095.01
## SPAGNOLO/GISNESS & ASSOCIATES
## CONSULTANT AGREEMENT NO. 110095.01-01

1.   **BASIS OF THE WORK** – The Consultant will provide **Architectural and Structural Engineering Services** on a Lump Sum Basis for the Project.   The project consists of a new 60,000 square foot prefab building in which the Consultant will provide core and shell architectural services only and structural foundation design services only, all services to be in accordance with the Symmes Maini & McKee Drawings dated May 5, 2000, a copy of which is included herein by reference as fully as if herein set forth at length.

2.   **EXCLUSIONS** - The Scope of Work, unless stated elsewhere herein, excludes the following items:

   A.   Detailed cost estimating.

   B.   Schematic design.

   C.   Computer rooms, labs, and process piping.

   D.   Consulting engineers for HVAC, plumbing, electrical, and environmental.

   E.   Regulatory meetings and presentations and/or environmental permitting services except for as stated herein or as required by the Request for Proposal.

   F.   Surveys, subsurface investigations and hazardous waste reports.

   G.   Marketing materials including models, signage, logos, brochures and graphics.

   H.   Design revisions required by the Company following the approval of the construction documents.

   I.   Participation in or preparation of application for utility company rebate programs.

   J.   Major revisions to the design that result in a change in usable area.

   K.   Cabling and connections for telephone, data and/or audio visual systems.

   L.   Development and issuance of Owner requested design modifications and revisions during the construction phase.




M.    Confirmation of the accuracy of record drawings.

N.    Needs profile and interviews associated with the programming of prospective tenants' space requirements.

O.    Future design, selection and specification services.

P.    Inventory of tenant's existing furniture and equipment.

Q.    Interior design and/or space planning services.

R.    Traffic study.

S.    Wetland approval process.

T.    Emergency Generator permitting.

3.    **ADDITIONAL CLARIFICATIONS** - The following items are mutually understood and agreed:

A.    The Fee for the architectural services set forth in Paragraph No. 1 above is based on a Not-to-Exceed maximum price of $102,000.00, to be reimbursed based on progress payments for work completed.   This work includes:

    1)    Design development;
    2)    Construction documents;
    3)    Construction administration;
    4)    Coordination of all consultant's drawings.

B.    The Fee for the structural engineering services set forth in Paragraph No. 1 above is based on a Not-to-Exceed maximum price of $12,000.00, to be reimbursed based on progress payments for work completed.   This work includes foundation design only.   McNamara/Salvia, Inc. will perform this service as sub-consultant.

C.    All reimbursement for additional services shall be in accordance with the Consultant's following current rates:

| | | |
|---|---|---|
| 1) | Principal in Charge | $140.00/hr; |
| 2) | Project Manager | $ 90.00/hr; |
| 3) | Job Captain | $ 75.00/hr; |
| 4) | Construction Administration | $ 80.00/hr; |
| 5) | CAD Illustration | $ 70.00/hr; |
| 6) | Architect | $ 70.00/hr; |
| 7) | Senior Designer | $ 65.00/hr; |
| 8) | Staff Designer | $ 60.00/hr; |
| 9) | Technical | $ 55.00/hr; |
| 10) | Architectural Drafter | $ 50.00/hr. |

 

D.   Reimbursable expenses, such as printing, shipping, travel, etc. shall be billed and paid to the Consultant at their actual cost, plus ten percent (10%) mark-up.  It is also understood and agreed that the reimbursable expenses shall not exceed $5,000.00 without the prior written consent of the Company's Designated Representative.  Expenses over and above this threshold will not be billable unless approval has been received in writing.   All expenses shall be backed up with the proper documentation, when applicable.

E.   The three (3) sets of progress plots and final CD plots are included in the fixed fees stated above and are not considered to be as reimbursable expenses.

F.   Design for typical acoustical treatment in open work areas, conference rooms and offices is included in the fixed architectural fee stated above.

G.   All work and services to be provided herein shall also be in accordance with the Project Team Meeting #1 dated June 23, 2000 (8 Pages), a copy of which is also included herein by reference as fully as if herein set forth at length.

**Page 3 of 3**                         **Attachment "A"**




REQUISITION FOR PAYMENT

TO:  **ADP MARSHALL, INC.**
2480 N. Arcadia Avenue
Tucson, AZ  85712

Date: _____

Job: _____

_____

Requisition for Payment # _____   Covering Month of _____

Sub Contractor: _____

Address: _____

Item of Work: _____

| BRANCH OF WORK | COST CODE | VALUE OF BRANCH | VALUE OF WORK COMPLETE TO LAST REPORT & MATERIALS STORED | VALUE OF WORK COMPLETE SINCE LAST REPORT & MATERIALS STORED | TOTAL VALUE WORK COMPLETE TO DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| NET ADDITIONS & DEDUCTIONS | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| **TOTAL** | | | | | |

NET AMOUNT OF CONTRACT TO DATE, INCLUDING ADDITIONS & DEDUCTIONS .................... _____
VALUE OF UNCOMPLETED WORK .................................................. _____
VALUE OF WORK COMPLETED TO DATE ........................................... _____
LESS _____ RETAINED _____
LESS PREVIOUS PAYMENTS _____
AMOUNT OF PAYMENT FOR MONTH OF _____

The undersigned Contractor certifies that the work covered by this application has been completed in accordance with the Contract Documents, that all amounts have been paid by him for work for which previous payment requisitions were issued and payments received from the General Contractor and that the current payment shown herein is now due.

Note: Requisition due in our office 26th of current month

# **EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY,    )
      Plaintiff    )
          )
v.    )
          )
ADP MARSHALL, INC., a FLUOR DANIEL COMPANY, and    )
FIREMAN'S FUND INSURANCE COMPANY,    )
          )
      Defendants    )
          )
          )  CIVIL ACTION
          )  NO. 04-CV-10203-PBS
ADP MARSHALL, INC.,    )
      Plaintiff-in-Counterclaim,    )
          )
v.    )
          )
MASSACHUSETTS DEVEOPMENT FINANCE AGENCY,    )
      Defendant-in-Counterclaim    )
          )
ADP MARSHALL, INC.,    )
      Third-Party Plaintiff    )
          )
v.    )
          )
ALLIED CONSULTING ENGINEERING SERVICES, et al.    )
      Third-Party Defendants    )

## AFFIDAVIT OF WILLIAM GISNESS

I, William Gisness, hereby state and depose the following under oath:

1. I am William Gisness, a principal at Spagnolo/Gisness & Associates, Inc. ("SGA"), a named third-party defendant in this suit. SGA is an architectural firm located at 200 High Street, Boston, Massachusetts.

2. On or about September 26, 2000, SGA entered into an agreement (the "SGA Agreement") with ADP Marshall, Inc. ("ADPM") to provide core and shell architectural services for the Advanced Technology & Manufacturing Center (the "Project"). A copy of SGA's contract with ADPM is attached as Exhibit A.

1

3. SGA's scope of work for the Project did not include design and/or installation of the HVAC system or design and installation of the windows. See Exhibit A.

4. SGA also conducted periodic site visits during construction and until the Project was occupied

5. The architectural services provided by SGA for the Project were consistent with the applicable professional standard of care. SGA performed its work with care and did not provide deficient services for the Project.

6. I have not seen anything in the Complaint which attributes any of the alleged problems to the architectural services provided by SGA.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 14th DAY OF JUNE, 2005.

William Gisness

00924017

2